UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE:                                          :        CHAPTER 11
                                                :
JOON ASSOCIATES, INC., D/B/A                    :
TROCADERO THEATRE                               :
                                                :        CASE NO. 11-_____( )
                                                :
            Debtor                              :

Commonwealth of Pennsylvania                    :
                                                :        SS
County of Philadelphia                          :

    Joanna M. Pang, being first duly sworn upon oath, deposes and states as follows:

    1.    I am the President, sole shareholder, and sole member of the Board of Directors (the "Board") of Joon Associates, Inc., d/b/a Trocadero Theatre (the "Debtor", or the "Company"). I submit this Affidavit in support of the motions ("Motions") that the Debtor has filed in this Court seeking emergency relief following the commencement of its voluntary Chapter 11 case on August 16, 2011 (the "Petition Date"), under the 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code").

    2.    I received my Bachelor of Science degree in Business Administration from the Drexel University in 1987. Prior to my employment with the Company, I was employed as a Vice President with the Bank of New York from 1987 through 1995. I have owned and operated the Company since its incorporation in 1996. Currently, I serve as the President of the Company, a Director of the Company, as well as the sole shareholder of the Company.

    3.    Accordingly, I am familiar with the Company's books and records, which are maintained in the ordinary course of business under my supervision, the Company's business and financial history, its operations, and its current business and financial situation. Accordingly, if

PH1 2888102v8 08/16/11

called as a witness, I could and would competently testify to the matters set forth herein from my own personal knowledge.

## COMPANY BACKGROUND

4. The Company is a Pennsylvania corporation organized under the laws of the Commonwealth of Pennsylvania.

5. On March 29, 1996, pursuant to certain articles of incorporation filed in the Commonwealth of Pennsylvania, the Company was formed.

6. The Company is the operator of an events venue known as the Trocadero Theatre (the "Trocadero" or the "Facility"), located at 1003 Arch Street, Philadelphia PA, 19107. The Company hosts live entertainment attractions, including concerts, and other acts or events (the "Attractions") at the Trocadero.

**Licensed User Agreement**

7. Prior to the Petition Date, the Company was a party to that certain Licensed User Agreement, with amendments thereto (the "Licensed User Agreement"),[1] by and between the Company and Ticketmaster LLC ("Ticketmaster").

8. Under the terms of the Licensed User Agreement, Ticketmaster is the Company's exclusive agent for the sale of all Tickets[2] to customers for Attractions held at the Facility *via* the TM System,[3] which includes Internet Sales,[4] Outlets,[5] and Telephone Sales.[6] Ticketmaster

---

[1]   On February 15, 2008, an Amendment to the Licensed User Agreement was entered into by and between the Debtor and Ticketmaster (the "Amendment").

[2]   "Ticket" is defined in the Licensed User Agreement as "a printed, electronic, or other type of evidence of the right to occupy space at or to enter or attend an Attraction, including, without limitation, tickets printed via *ticketFast*™ at home or elsewhere by the purchaser even if not evidenced by an physical manifestation of such right, such as a 'smart card.'" Licensed User Agreement at ¶ 1(cc).

[3]   "TM System" is defined in the Licensed User Agreement as:

2

collects the face value (the "Face Value") of the Tickets from the customers. Ticketmaster charges customers, in addition to the Face Value of the Tickets, a Convenience Charge[7] and a Processing Fee in the amount of $3.10 per Ticket[8] (collectively, the "Inside Charges").

9. Pursuant to the terms of the Licensed User Agreement, Ticketmaster calculates Ticket sale royalties (the "Royalties"), which Royalties are calculated based upon each Convenience Charge and Processing Fee.

10. Ticketmaster retains the Inside Charges from the sale of the Tickets, and then deposits the Face Value of all Tickets sold to an Attraction and Royalties, less any taxes that Ticketmaster is required to remit to taxing authorities (the "Ticket Receipts"), into the Company's Operating Account (as discussed below).

11. Pursuant to the terms of the Licensed User Agreement, the Company holds the right to sell single Tickets from the box office located at the Facility (the "Facility Box Office").

---

> the Hardware, Software, TM.com Website, related procedures and personnel, and repair and maintenance services established and maintained by Ticketmaster and its affiliates for the purpose of selling, distributing, auditing and controlling the sale of Tickets for Attractions, including, without limitation, at Outlets, by Internet Sales and by Telephone Sales.

Licensed User Agreement at ¶ 1(hh).

[4] "Internet Sales" is defined in the Licensed User Agreement as "all sales of Tickets over the Internet or any other means of interaction with the TM.com Website." Licensed User Agreement at ¶ 1(o).

[5] "Outlets" is defined in the Licensed User Agreement as "a retail Ticket selling agency (other than the Facility Box Office) where Tickets for an Attraction are made available and offered for sale to the public through the TM System." Licensed User Agreement at ¶ 1(r).

[6] "Telephone Sales" is defined in the Licensed User Agreement as "all sales of Tickets through the TM System by telephone, interactive voice response (IVR) and similar means." Licensed User Agreement at ¶ 1(z).

[7] "Convenience Charge" is defined in the Licensed User Agreement as "the per Ticket amount charged by Ticketmaster to a consumer for the convenience of purchasing Tickets through the TM System." Licensed User Agreement at ¶ 1(f).

[8] "Processing Fee" is defined in the Licensed User Agreement as "the per order amount charged by Ticketmaster to a consumer for purchasing Tickets via Internet Sales or Telephone Sales." Licensed User Agreement at ¶ 1(t).

See Licensed User Agreement at ¶ 4(b). Customers that purchase Tickets in person at the Facility Box Office do not incur a Convenience Charge or a Processing Fee.

12. Pursuant to the terms of the original Licensed User Agreement, Ticketmaster received a Convenience Charge for Ticket sales through the TM System based on the following schedule:

| Face Value of Tickets | Outlets (Cash Price) | Internet Sales and Telephone Sales |
|---|---|---|
| $0.00 - $10.00 | $3.00 | $3.00 |
| $10.01 - $15.00 | $4.50 | $4.50 |
| $15.01 - $20.00 | $5.25 | $5.25 |
| $20.01 - $25.00 | $5.85 | $5.85 |
| $25.01 & above | $6.50 | $6.50 |

See Licensed User Agreement at ¶ 3(b).

13. Pursuant to the terms of the original Licensed User Agreement, the Company received Royalties according to the following schedule:

| Type of Royalty | Amount of Royalty | Share of Increase in Applicable Charge or Fee |
|---|---|---|
| Convenience Charge $3.00 | $0.50 | 20% of Convenience Charge |
| $4.50 | $1.35 | 30% of Convenience Charge |
| $5.25 | $1.58 | 30% of Convenience Charge |
| $5.85 | $1.75 | 30% of Convenience Charge |
| $6.50 | $1.95 | 30% of Convenience Charge |
| Processing Fee | $2.00 for Will Call orders $1.00 for non-Will Call orders | |

4

PH1 2888102v8 08/16/11

14. The Company then remits to the concert promoters the amount of the Face Value of the Ticket, plus a percentage (%) of the Royalties, from its Operating Account (the "Promoter Ticket Receipts").

15. Pursuant to the Amendment to the Licensed User Agreement, Ticketmaster modified the amount of Convenience Charge for Tickets sold. Beginning on February 15, 2008, Ticketmaster received a Convenience Charge on Ticket sales through the TM System based on the following schedule:

| Face Value of Tickets | Outlets (Cash Price) |
|---|---|
| Under $10.00 | $3.00 |
| $10.01 - $15.00 | $4.50 |
| $15.01 - $20.00 | $5.25 |
| $20.01 - $25.00 | $5.85 |
| $25.01 to $50.00 | $7.50 |
| $50.01 and above | $8.50 |

16. Additionally, pursuant to the terms of the Amendment, the Company received Royalties based on the following schedule:

| Type of Royalty | Amount of Royalty | Share of Increase in Applicable Charge or Fee |
|---|---|---|
| Convenience Charge | | |
| $3.00 | $0.50 | 20% of Convenience Charge |
| $4.50 | $1.35 | 30% of Convenience Charge |
| $5.25 | $1.58 | 30% of Convenience Charge |
| $5.85 | $1.75 | 30% of Convenience Charge |
| $7.50 | $2.25 | 30% of Convenience Charge |
| $8.50 | $2.55 | 30% of Convenience Charge |
| Processing Fee | $2.00 for Will Call orders $1.00 for non-Will Call orders | |

5

17. Subsequent to executing the Amendment, the Company has experienced a decrease in the sale of Tickets through the TM System due to the increase in the Convenience Charge. Rather than ordering Tickets through the TM System, customers purchased Tickets to the Attractions in person at the Facility Box Office to avoid the prohibitive Convenience Charge.

18. The effect on the Company of the increase in the Convenience Charge has resulted in a reduction in the Royalties that it receives due to a decrease in the number of Tickets sold through the TM System.

19. In the Company's business judgment, there are other ticketing agencies in the marketplace that can provide similar services as Ticketmaster, that do not require the same high Convenience Charges and Processing Fees. Moreover, these companies would pay twice the amount of royalties to the Company than the Royalties currently paid by Ticketmaster to the Company. Such a contract would result in a more profitable business arrangement than the contract with Ticketmaster.

**Equity and Debt Structure**

20. The Company's equity structure as of the Petition Date - ownership of membership interests in the Company, on a fully diluted basis - is as follows:

**Amount (%)**

Joanna Pang    100%

**Events Leading to the Chapter 11 Filing**

21. For the taxable year ending 2008, the Company generated $2,314,049 in gross receipts. After deducting the Company's cost of goods sold in the amount of $858,585, the Company reported $1,455,464 in total taxable income. However, after taking into account all of the Company's deductions for compensation, wages, repairs, rents, taxes and licenses,

6

advertising, and other costs to operate the business in the amount of $1,405,199, the Company only generated $50,265 in ordinary business income.

22. For the taxable year ending 2009, the Company's gross receipts declined to $2,119,054, while its cost of goods sold increased to $950,839. The decrease in the Company's gross receipts and increase in the cost of goods sold is due in part to the increase in the Convenience Charge due to Ticketmaster pursuant to the Amendment to the Licensed User Agreement. After taking into account all of the Company's deductions in the amount of $1,153,433, the Company only generated $14,782 in ordinary business income.

23. Making matters worse, on May 18, 2010, a lawsuit (the "Civil Suit") was filed against the Company and the lessor of the Facility, Northwest Arch, LLC ("Northwest"), in the Court of Common Pleas of Philadelphia County, First Judicial District of Pennsylvania, Civil Trial Division, captioned *Rachel Murphy v. Joon Associates, Inc. d/b/a Trocadero Theatre & Northwest Arch, LLC* (May Term, 2010, No. 2541). The Civil Lawsuit demands judgment against the Company and Northwest, jointly and severally, in an amount in excess of $50,000 in compensatory damages plus delay damages, interest and costs.

24. The Company is a party to that certain Lease Agreement (the "Lease Agreement") dated January 31, 1997 by and between Northwest and the Company. The Company is the lessor of the Facility.

25. On July 14, 2011, a Complaint in Confession of Judgment Under Pa. R.C.P. 2951 (the "Confession of Judgment") was filed against the Company in the Court of Common Pleas of Philadelphia County, First Judicial District of Pennsylvania, Civil Trial Division, captioned *Northwest Arch, LLC v. Joon Associates, Inc.* (July Term, 2011, No. 1363). The Confession of Judgment demands a judgment against the Company in the amount of $196,422.00.

26.    The Company filed this Chapter 11 proceeding in order to permit the Company to be relieved from the burdensome obligations of the Licensed User Agreement, and to avoid the Plaintiff in the Civil Suit from obtaining a judgment, and to prevent the Plaintiff in the Confession of Judgment from converting its judgment into a secured claim.

## MOTIONS

### Employee Compensation and Benefits Motion

27.    Prior to the Petition Date and in the ordinary course of business, the Company provided its employees (the "Employees") with wages, salaries, and benefits. The Company funds its payroll on a bi-weekly basis. The Company's payroll is paid approximately one (1) week in arrears. The Company seeks authority, in its discretion, to pay and/or honor, as the case may be, on the next regularly scheduled payroll date of August 26, 2011, certain prepetition claims for wages, salaries, and benefits incurred by Employees on behalf of the Company, Employee deductions, and certain costs incident to the foregoing (the "Employee Wages and Benefits").

28.    The Company's Employees are essential to the success of the business. Consequently, it is critical that the Company continue to honor it prepetition obligations to the Employees and to satisfy Employee Wages and Benefits.

29.    The Company employs a total of six (6) full-time Employees and thirty-three (33) part-time Employees. Prior to the Petition Date, in the ordinary course, the Company incurred payroll obligations to its Employees for the performance of their services. The Company also participates in or is obligated under various salary and wage plans, insurance plans and other programs designed to provide benefits to the Employees.

8

30. The Employees of the Company are paid every two (2) weeks. The Employee Wages and Benefits are collected and remitted by Streamline Payroll (the Company's payroll servicer). The Company's last pre-petition payroll was on August 12, 2011. The Company's payroll is paid approximately one (1) week in arrears. The Company's total average pay period obligations are approximately $18,000.00, which fluctuates depending on the hours accrued by the part-time Employees.

31. As of the Petition Date, no Employee is owed in excess of the $11,725 statutory cap set forth in section 507(a)(4) of the Bankruptcy Code. The Employees have not received wages, salaries, and benefits for their services for the period of August 6, 2011 through the Petition Date. Specifically, the gross amount of Employee prepetition wages is approximately $11,571.43. The outstanding amount of benefits for the same time period is approximately $3,368.06.

32. The Company also sponsors health and benefit programs for the Employees. The major benefit program is as follows:

    **a.**    **Medical Insurance**

The Company provides medical insurance coverage through Keystone Health Plan East as the insurer. The Company absorbs the majority of the costs under the Plan because the Company pays eighty percent (80%) of the premiums for each full-time Employee and fifty percent (50%) of the premiums for full-time Employee dependents, if any. The average monthly cost of the medical insurance is $3,368.06, which is paid directly by the Company. The outstanding amount of Employee prepetition benefits for the period of August 6, 2011 through the Petition Date is approximately $3,368.06.

9

33. Thus, the gross amount of prepetition Employee Wages and Benefits that need to be paid to the Employee for the prepetition period is approximately $14,939.49.

**Motion for Maintenance of Bank Accounts and Forms**

34. As of the Petition Date, the Company maintained three (3) bank accounts. A chart listing all of the Company's bank accounts (the "Bank Accounts") is attached to the motion seeking authority to use existing bank accounts and business forms as Exhibit A.

35. The flow of funds among the various Bank Accounts is as follows:

**Operating Account**

- The Company maintains its operating account at Citibank, N.A. ("Citibank") (Account No. 759484055) (the "Operating Account"). The Operating Account is the Company's primary Bank Account. Ticket Receipts from sale of Tickets to the Attractions, combined with other income, is deposited into the Operating Account. The Operating Account is used to transfer the Promoter Ticket Receipts to the concert promoters on a monthly basis. The Operating Account is also used to make payments to certain vendors and distributors. The Operating Account also serves as a concentration account with respect to the Merchant Services Account and the Payroll Account (each as described below). The Operating Account receives funds from the Merchant Services Account on at least a quarterly basis. The Operating Account is also used to transfer funds into the Payroll Account to fund the Payroll.

10

**Merchant Services Account**

- The Company maintains its merchant services account at Citibank (Account No. 759484039) (the "Merchant Services Account"). Receipts from credit card sales are deposited directly into the Merchant Services Account. The Company then transfers the receipts from the credit card sales from the Merchant Services Accounts to the Operating Account.

**Payroll Account**

- The Company maintains its payroll account at Citibank (Account No. 759484047) (the "Payroll Account"). The Payroll Account is funded by the Operating Account. Checks are issued to the Company's employees from the Payroll Account every two (2) weeks.

36. In the ordinary course of business, the Company uses numerous varieties of business forms. To minimize expenses to its estate and avoid confusion on the part of employees, customers and vendors, the Company respectfully requests that the Court authorize the Company to continue to use all correspondence and business forms (including, without limitation, checks, letterhead, purchase orders and invoices (collectively, the "Business Forms") as such forms were in existence immediately before the Petition Date, with a stamped notation of "Debtor-In-Possession" on all checks, *provided however,* that upon depletion of the Company's Business Forms stock, the Company will obtain new check stock reflecting its status as debtor-in-possession. With such authorization, the Company will be able to avoid the expense and delay of ordering entirely new business forms and the delay and disruption to the Company that such delay will cause.

37. The Company's ability to maintain and use the existing Bank Accounts will significantly facilitate the Company's operations in the Chapter 11 case. Maintaining the Company's existing Bank Accounts will facilitate the receipt of payments from Ticketmaster that are electronically deposited into the Operating Account. Thus, the Company should be permitted to continue to maintain the existing Bank Accounts and, if necessary, to open new debtor-in-possession accounts.

**Utilities Procedure Motion**

38. In connection with the operation of its business and management of its properties, the Company purchases electricity, telephone and similar services (together, the "Utility Services") from a number of different utility companies (the "Utility Companies"). A list of the Utility Companies who provide services to the Company as of the Petition Date (the "Utility Service List"), and the estimated monthly average of amounts owed to each Utility Company, and the proposed deposit that the Company intends to provide to the Utility Companies as adequate assurance of future payment is attached to the motion seeking the establishment of procedures for the payment of Utility Services as Exhibit A.

39. The Company seeks the entry of an order (i) prohibiting the Utility Companies from altering, refusing or discontinuing service to the Company, (ii) deeming the Utility Companies adequately assured of future payment and (iii) establishing procedures for determining requests for additional adequate assurances of payment.

40. To provide adequate assurance of payment for future services to the Utility Companies, the Company proposes to deposit (a "Utility Deposit") with the Utility Companies an amount equal to 50% of the Company's estimated cost of monthly utility consumption for each such Utility Company. The aggregate amount of all such deposits for the Utility

Companies listed on Exhibit A hereto would be approximately $2,835. The Company proposes to pay the Utility Deposit to each of the Utility Companies.

41.     Specifically, the Company request the entry of an order establishing reasonable procedures (the "Procedures") by which a Utility Company may request additional adequate assurance of future payment, in the event that such Utility Company believes that its respective Utility Deposit is insufficient. The Procedures provide as follows:

> a.     Absent any further order of this Court, the Utility Companies are prohibited from discontinuing, altering, or refusing service on account of any unpaid prepetition charges, or requiring payment of an additional deposit or receipt of other security in connection with any unpaid prepetition charges;
>
> b.     If a Utility Company is not satisfied with the assurance of future payment provided by the Debtor, the Utility Company must serve a written request (the "Request") upon the Debtor and its counsel (as set forth below) stating the location(s) for which Utility Services are provided, the account number(s) for such location(s), the outstanding balance for each account, a summary of the Debtor's payment history on each account, and an explanation of why its Utility Deposit is inadequate assurance of payment;
>
> c.     The Request must be delivered to Debtor's counsel, Fox Rothschild LLP, 2000 Market Street, 20th Floor, Philadelphia, PA 19103, Attn: Michael Menkowitz, Esq., so as to be actually received within forty-five (45) days of the date of the order granting this Motion (the "Request Deadline");
>
> d.     Without further order of the Court, the Debtor may enter into agreements granting additional adequate assurance to a Utility Company serving a timely Request, if the Debtor, in its discretion, determines that such Request is reasonable;
>
> e.     If the Debtor believes that a Request is unreasonable, within thirty (30) days after the Request Deadline date, it shall file a motion pursuant to section 366(c)(2) of the Bankruptcy Code (a "Determination Motion"), seeking a determination from the Court that the Utility Deposit, plus additional consideration offered by the Debtor, if any, constitutes adequate assurance of payment. Pending notice and a hearing on the Determination Motion, the Utility Company that is the subject of the unresolved Request may not alter, refuse, or discontinue services to the Debtor nor recover or setoff against a prepetition deposit; and

13

   f. Any Utility Company that fails to make a timely Request shall be deemed to be satisfied that the Utility Deposit provided to it supplies adequate assurance of payment.

  42. The services provided by the Utility Companies are vital to the ongoing operation of the Company's business. If the Utility Companies are permitted to terminate Utility Services, the Company's operations will be irreparably harmed and its ability to reorganize jeopardized.

  43. Historically, the Company has paid all amounts owing to the Utility Companies on a timely basis. To the best of the Company's knowledge, the Company is current with respect to all of their invoices for Utility Services, except where the commencement of this chapter 11 case may have provided payment of the prepetition charges due. Prior to the Petition Date, the average aggregate monthly cost of Utility Services for the Company was approximately $5,668.33.

  44. The Company believes it will have adequate liquidity to pay for all postpetition utility charges on a current basis. Thus, the Company will continue its customary practice of paying their utility bills as they become due.

  45. I declare under penalty that to the best of my knowledge, the foregoing is true and correct.

             _____
             Joanna M. Pang, President

Sworn to and Subscribed
Before me this ___ day
of _____, 2011

_____
Notary Public:

My commission expires: _____

```
NOTARIAL SEAL
MARY A OREO
Notary Public
PHILADELPHIA CITY, PHILADELPHIA CNTY
My Commission Expires May 22, 2013
```

14